Oh, yay. Oh, yay. Oh, yay. The Honorable Appellate Court Fifth District State of Illinois is now in session. The Honorable Justice Moore presiding, along with Justice Bowie and Justice Warden. The first case this morning is number 518-0023, People v. Harris. Arguing for the appellant, Alvin Harris, is Chris Selog. Arguing for the appellee, People of the State of Illinois, is Michael Lennox. Each side will have 10 minutes for their argument. The appellant will also have five minutes for rebuttal. You'll see the digital timekeeping device on my screen. When time has expired, I'll hit the gavel. Please remember, no photographs, and only the clerk of the court is permitted to record these proceedings today. Counsel, for appellant, you may proceed. May it please the court, my name is Chris Selog with the State Appellate Defender's Office, and I represent the defendant in this case, Mr. Alvin Harris. Mr. Harris has an IQ of 60 and the cognitive functions of a 9 or 10-year-old child. For his entire life, Mr. Harris has struggled with depression, addiction, and a particular sensitivity to rejection and abandonment, real or imagined. This is the proper lens through which to view his case, but unfortunately, the trial court failed to recognize these circumstances at the judgment and sentencing stages of Mr. Harris's trial. Specifically, the trial court found Mr. Harris guilty but mentally ill of first-degree murder, even though he had met his burden of proof in mitigating his charge of second-degree murder, and the trial court erred in sentencing Mr. Harris to a de facto life sentence in violation of the Proportionate Penalties Clause of the Illinois Constitution. For these reasons, Mr. Harris respectfully requests this court to reduce his sentence to second-degree murder or, alternatively, to vacate his sentence and remand of the trial court for a new sentencing hearing. As to the first issues, Mr. Harris should have been sentenced to second-degree murder instead of first-degree murder. There are six elements of self-defense affirmative defense, but second-degree murder only requires the first five. Those elements are unlawful force was threatened against the defendant, the defendant was not the initial aggressor, the danger of harm was imminent, the use of force was necessary, and the defendant subjectively believed a danger existed requiring the use of force applied. In this case, the state only contests three elements, that Mr. Harris was not the initial aggressor, that the danger of harm was imminent, and that the use of force was necessary, necessarily conceding that unlawful force was threatened against Mr. Harris and that he had a subjective belief that a danger existed requiring the use of force applied. When considering these factors, there only has to be some evidence, even very slight evidence, that a mitigating factor existed in this case. Where some evidence exists, consideration is necessary to determine whether or not Mr. Harris was the initial aggressor in the second-degree murder, even when that evidence is inconsistent, conflicting, or of doubtful credibility. Your Honors, Mr. Harris proved the three contested elements at trial by a preponderance of the evidence. As to the first contested element, Mr. Harris was not the initial aggressor. There is plenty of evidence to suggest that Mr. Harris was attacked first. The state relies on evidence that Mr. Harris was not the initial aggressor. However, there's no evidence to support the state's conjecture that Mr. Harris was unlawfully present at Ms. Day's apartment, nor is there any legal support that this would make him the initial aggressor on its own. Mr. Harris's testimony presents evidence that he was trying to resolve an argument with Ms. Day when she stabbed him. He did not grab a knife or any other weapon until after he was stabbed by Ms. Day. However, this case is not the same as others where the use of force was unlawful. In Peeble v. Sloan from 1986, the defendant argued that he went to his ex-girlfriend's house to visit his child, but was armed with a shotgun and pushed his way into a house. In that case, the court found that a second-degree murder charge was not appropriate. Similarly, in Peeble v. Metallero, the defendant did not have a self-defense theory where he was kicked out of a bar and came back fully armed. Your Honors, throughout this case, it is important to remember that Mr. Harris is severely mentally ill and that he suffers from depression and abandonment issues. Dr. Cuneo's diagnosis of Persistent Depressive Disorder and Borderline Personality Disorder speak volumes here. In the incident that took place in this case, Mr. Harris likely felt like he was being pushed away again by a loved one, as has happened several times before in his life. Shredda Day pulled a knife on him while they were having an argument. At least some evidence exists to suggest he was not the initial aggressor, which means the trial court should have considered second-degree murder instead of first-degree murder. Likewise, Your Honors, the danger of harm was imminent to Mr. Harris. The state relies on size disparities and assumptions about the relationship between Harris and Ms. Day to suggest that the danger of harm was not imminent. However, the state fails to come to terms with the fact that no evidence suggests he ever invited any harm or that he failed to retreat. There is no evidence to suggest that Mr. Harris, quote, walked up on Ms. Day after she asked him not to do that. What about the evidence of the wounds on the decedent? Wouldn't that be evidence of failing to retreat? Two wounds to each lung and a stab wound to the head. No, Your Honor, because Ms. Day attacked Mr. Harris first, and in response to being attacked, he then defended himself. And while he may have stabbed her more times than he necessarily needed to, he was acting under an unreasonable belief in self-defense. And he was attacked first, and the fight lasted long enough to spill out from the bedroom into the living room, suggesting that this wasn't over and done with in a quick instant, but this was a prolonged fight, and Mr. Harris did believe that he had to defend himself from deadly force. As to the final contested element, Your Honors, Mr. Harris subjectively believed that the use of force was necessary. There's plenty of evidence to suggest this point as well. Again, in contesting this point, the state relies primarily on a size difference between Harris and Day. However, this fails to account for the fact that Ms. Day stabbed Mr. Harris first with a knife. It also fails to account for the fact that the struggle lasted long enough to spill over into the living room and get Nicholas Day involved. Again, Mr. Harris's intellectual and mental disabilities have to be considered when considering these elements. As Dr. Cuneo said in his report, he is extremely sensitive to rejection. That is a direct quote from Dr. Cuneo. Mr. Harris never had any family support and had, quote, a brutal upbringing, according to Dr. Cuneo, which meant that he felt abandoned for his entire life. Being stabbed would put anyone in the state of mind that their life was at risk, let alone someone with the mental and intellectual functions of a child. We wouldn't expect a child to believe deadly force wasn't necessary, so we shouldn't expect Mr. Harris to believe that deadly force wasn't necessary. Excuse me a moment. You seem to be comparing Mr. Harris to a child. Isn't there a difference between a person with intellectual and perhaps mental deficiencies who is actually a child and someone who is an adult? Because the adult has had life experiences to condition himself to know when there is a threat. Otherwise, it would be very difficult for someone to survive without that life experience. I don't think you can really compare him to a child of nine or 10 years. Can you address that? Yes, Your Honor, and this dovetails with the second issue as well. The single issue that permeates the entirety of this case is that Mr. Harris, as noted by Dr. Cuneo, has the cognitive functions of a nine or 10-year-old. Dr. Cuneo did state that he could take care of himself, but what that amounts to is that he can find his way to a bus stop and he can buy food for himself, but he is not necessarily, in terms of his intellectual and mental capabilities, the same as a grown adult with those life experiences. Tack on to that is, quote, brutal upbringing from Dr. Cuneo, as well as his history of depression and substance abuse disorders. This whirlwind of intellectual, mental, substance abuse disabilities creates the proposition that Mr. Harris effectively is a child in terms of culpability. But to stop you there, counsel, isn't that the reason he was found guilty but mentally ill? So he was given some deference because of those disabilities, correct? Yes, Your Honor, however, and again, along this dovetails with the second issue that the mental and intellectual disabilities, the evidence shows that there wasn't a true consideration of how these disabilities affected Mr. Harris and his culpability in this case. And this was a bench trial, correct? Yes, Your Honor. Well, how do we know that the judge didn't take those considerations into account? Because comparing the evidence adduced at trial and at sentencing to the actual effects as mental and intellectual disabilities, it becomes clear that the trial court did not truly consider the ramifications of these disabilities or else they would not have made the rulings they made. These disabilities speak to Mr. Harris's state of mind when defending himself and also speak to his culpability in terms of his sentence in this case, Your Honor. And for those reasons, Your Honors, because Mr. Harris, Mr. Harris's intellectual and mental disabilities may give him the cognitive functions of a nine or ten-year-old, we ask that this court, Your Honor, I see my time is up. You can make your concluding statement, counsel. Thank you, Your Honor. For those reasons, Your Honors, because of Mr. Harris's intellectual and mental disabilities, because they affect his culpability and his state of mind, his ability to understand and appreciate what his sentence means, we would ask this court to either reduce Mr. Harris's sentence to second-degree murder or, in the alternative, vacate his sentence and remand for a new sentencing hearing in compliance with the Proportionate Penalties Clause. Thank you. Thank you, counsel, counsel for Appleby. Yes, Your Honor. Your Honors, and may it please the court. My name is Michael Lennox, and I'm here on behalf of the people of Illinois. And might I say it's truly an honor to be before this court this morning. Your Honors, this court should affirm the defendant's first-degree murder conviction and 60-year sentence because the defendant cannot prove the necessary elements of self-defense and because the trial court did not abuse its discretion in sentencing the defendant within the statutorily set limits. First, this court should affirm the defendant's first-degree murder conviction because the defendant was the initial aggressor, the danger of harm to the defendant was not eminent, and the use of force was entirely unnecessary. Now, the defendant and I can squabble over whether we believe self-defense was present here, but that is not the standard of review. The standard of review is whether, after viewing the evidence the like most favorable to the defendant, self-defense was present or not present. To prove self-defense, as opposing counsel stated, to prove self-defense generally, the defendant must show unlawful force was threatened against the defendant, the defendant was not the aggressor, the danger of harm was eminent, the use of force was necessary, the defendant subjectively believed a danger existed that required the use of force applied, and the defendant's belief was objectively reasonable. To drop the charge from first degree to second degree, the defendant is not required to show the objective that his belief was objectively reasonable. However, if the state negates any one of the elements of self-defense, the defense fails. Your honors, the trial court rationally found that the defendant was guilty of first-degree murder because he was the initial aggressor. The defendant admits to having been kicked out of the victim's apartment the day before the incident, which can be seen on page 501 of the record, where he says, when speaking about the victim, she told me, she told me, yeah, she told me that I need to get my things and leave. On the same page, he confirmed he had not told his daughter, or he had told his daughter that he had nowhere else to go. He also admitted to being kicked out in the state's exhibit at minute 37, seconds 30. The defendant also admits the victim told him to leave multiple times in the state's exhibit 4. At minute 740, he said, I came by and she said, get out. Why are you just coming over here unannounced? At minute 1420, he said, she was telling me to leave. At minute 1430, he said, she said, Alvin, you need to go on and leave. And at minute 1740, he said, she was telling me to get out. The defendant admits being told by the victim to not come any closer, yet he did. On pages 494 and 95 of the record, he states, when I came into the bedroom, she had taken the knife out of her purse. She said, Alvin, don't walk up on me. And again, in the state's exhibit at minute 445, he says, I was walking up on her. And she said, Alvin, don't walk up on me. And at minute 1910, he says, she pulled the knife on me talking about don't walk up on her. The defendant has not authorized or was not authorized to be in the victim's home and advanced on her in her bedroom after she had told him not to come any closer, making him the initial aggressor. Your honors, the trial court rationally found that the defendant was guilty of first degree murder because the threat of harm to the defendant was not eminent. In U.S. versus Feather, the Seventh Circuit said, if the threat is not eminent, a retreat or similar step avoids injury. As previously stated, the defendant testified at trial. He followed the victim into her bedroom. He watched her pull the knife out of her purse. He heard her tell him not to come any closer. But despite the sight of the knife and the warning not to come any closer, he still approached her. The threat was not eminent because he was given every opportunity to leave prior to being stabbed. And finally, your honors, in the self-defense argument, the trial court rationally found that the defendant was guilty of first degree murder because the defendant's use of force was entirely unnecessary. The right of self-defense, as the Second District Court of Appeals states, the right of self-defense does not justify a person in committing an act of retaliation and revenge, nor does it permit one to pursue and inflict injury upon even an initial aggressor after the aggressor abandons the quarrel. And the First District Court of Appeals in People versus None, the court states, if one responds with such excessive force that one is no longer acting in self-defense but in retaliation, said excessive use of force renders one the protagonist, a non-aggressor has a duty not to become the aggressor. Now, your honors, in the defendant's own oral argument, he just conceded he stabbed her more times than he necessarily needed to. And the right to, or, and at the time of the crime, the defendant was an able-bodied male who weighed 5'9", 210 pounds. At the time of the crime, the victim was physically disabled with one leg four inches shorter than the other, 4'10", and 90 pounds. As previously stated, the defendant was told to leave. The defendant admits to disarming the victim and the victim ended up in the bedroom where the, or ended up in the living room away from the knife that had been dropped in the bedroom, terminating the threat to his life. The defendant stabbed the victim with the knife he had taken from her, and the defendant stabbed the victim over 10 times, including two stabs to the left lung, two stabs to the right lung, and one to the heart. All of these facts are important in the consideration of whether the use of force was necessary, and it's clear, it's clearly excessive and retaliatory force that was unnecessary. Since the defendant failed to prove all the elements of self-defense necessary to reduce the charge of first-degree murder to second-degree murder, and since the defendant cannot show that the trial court acted so rationally that no rational trier would have found as such, this court should affirm the defendant's first-degree murder conviction. Moving on to the second issue, the court should affirm the defendant's 60-year prison sentence because the court did not abuse its discretion when it properly considered all the factors in aggravation and mitigation and sentenced the defendant within the statutorily set limits. The appellate court case of Peeble v. Coddy that the defendant relies on in his initial brief  without the appellate case, the defendant has no basis in any authority to support an intellectually disabled adult's de facto life sentence being a proportionate penalties clause violation. At most, the defendant critiques my reading of Coddy, but provides no authority to overcome his burden under an abuse of discretion standard. Absent an abuse of discretion by the court, as provided in Peeble v. Stacey, absent an abuse of discretion by the court, the sentence may not be altered on review. The defendant was convicted of aggravated battery, which is a class X felony, and the class X felony sentencing range is six to 30 years. The defendant was convicted of first-degree murder and the sentencing range for that is 20 to 60. The two crimes are mandatorily consecutive and a penalty as found in Peeble v. Sharp, another Illinois Supreme Court case, a penalty violates the proportionate penalties clause if it is cruel, degrading, or wholly disproportionate to the offense committed as to shock the moral sense of community. Now, the court in Coddy provided that an intellectually disabled adult's diminished capacity may reduce culpability, but it also made the defendant a continuing danger to re-offend. And along those lines, this defendant had actually, this isn't the first time that the defendant has threatened a significant other with a knife. He also threatened his ex-wife with a knife, then beat and sexually assaulted her, which can be found on pages 597 and 598 of the record. Your honors, since the defendant cannot prove all the elements of self-defense and since the trial court did not abuse discretion in sentencing and the entire basis, the entire legal basis for the defendant's argument in the de facto sentencing was overturned, this court should affirm the defendant's conviction and sentence. Thank you. Thank you, counsel. Rebuttal. Thank you, your honors. Briefly on rebuttal. The state argues that the defendant cannot prove the elements of unreasonable self-defense. In support of this, the state argues that Mr. Harris was kicked out of the apartment by Shredda Day, citing Mr. Harris's own language that she said something about me being kicked out. However, in that section of the record, shortly thereafter, he says he did not believe he was kicked out, but that they were merely having an argument. So Mr. Harris likely did not understand, even if he was kicked out by Ms. Day, that he had been kicked out, and he was there simply to resolve an argument that they were having over text message. Second, the state argues that Ms. Day repeatedly said, don't walk up on me. But there's no evidence that he ever did approach her again after he was warned. In fact, he told her, I was just showing her my cell phone. I was trying to show her the text message argument that we were having and trying to resolve things on my end. The state cites U.S. v. Feather for the argument that if danger is not imminent, then self-defense is not a reliable defense. However, the danger was imminent. Ms. Day pulled a knife on Mr. Harris, and then she stabbed him first before he made any move to approach her or attack her. Your honors, the state argues that the defense has no legal theory as to the second issue. However, the second issue is primarily governed by an abuse of discretion. While we are talking about the Proportionate Penalties Clause and the Supreme Court's recent ruling in People v. Cody, the standard for an abuse of discretion when discussing a mitigating factor it's sentencing is that failure to account for mitigating factors is an abuse of discretion and remand is appropriate. It comes from People v. Markowitz from the Second District in 1993. The state argues that Mr. Harris has no legal authority for the proposition that his sentence violates the Proportionate Penalties Clause because Supreme Court in People v. Cody overruled the First District case that the defendant relied on in his opening brief. However, the Supreme Court's decision in People v. Cody is not a categorical bar on Proportionate Penalties Clause claims by mentally and intellectually disabled defendants. If it were, then no intellectually or mentally disabled defendant could ever bring a Proportionate Penalties Claim, and that would not be an appropriate use of the justice system. The state argues that defendants' disabilities, according to People v. Cody, make him less culpable but more likely to re-offend. Such a reading of Cody in the categorical sense, in a totality sense, would effectively render mentally and intellectually disabled defendants latent criminals who are simply people who need to have the highest sentence possible given just in anticipation of committing a crime. This cannot be said to be a proper use of the justice system. The state also cites to Mr. Harris' previous conviction. However, at sentencing, the trial court said, I do not give much weight to those actions in 2006. So either the trial court said that it did not give weight to these actions or it relied too heavily on them. Either way, this is a failure to account for all of the circumstances that go into Mr. Harris' sentencing hearing. As People v. Maldonado said from the First District of 1992, the balancing of retributive and rehabilitative purposes of punishment requires careful consideration of the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, and social environment. That is what Mr. Harris is arguing in the second issue, Your Honors, that the trial court did not consider the totality of his life circumstances when giving him a sentence. They effectively told him he had to learn a lesson, which Dr. Cuneo noted in his testimony and his section of the PSI, that Mr. Harris simply was not likely to ever learn. Your Honors, Mr. Harris is not asking for this court to find him not guilty of first degree murder or to sentence him to a sentence for which his crimes do not account. All that Mr. Harris is asking is that he take into account his mental and intellectual disabilities, his lifetime of rejection and abandonment of depressive disorders, of substance abuse disorders, and realize that this was not a fair trial, pardon me, a fair judgment or a fair sentencing. The trial court should have recognized that Mr. Harris is, as was discussed with Justice Wharton, effectively a child in terms of his culpability and his ability to understand what his sentence actually means. For these reasons, we would ask this court to reduce Mr. Harris' sentence to second degree murder or alternatively to vacate his sentence and remand for a new hearing. Thank you. Thank you, counsel. This court will take the case under advisement and issue its decision in due course.